WILLIAM ATKINS, PLAINTIFF IN ERROR VS. PAUL G. PHILLIPS, CHIEF OF POLICE OF THE CITY OF JACKSONVILLE, DEFENDANT IN ERROR.

1. A charter act authorizes the Mayor and Council to impose, by ordinance, fines and terms of imprisonment for the breach of any ordinance, and provides a municipal court for the trial of all offences against ordinances, the establishment of such courts for the punishment of such offences being authorized by the Constitution, and an ordinance regulating the vending of fresh meats ordains that any violation of it shall be punished by fine or imprisonment not exceeding a specified maximum: *Held*, 1st, That the penalty prescribed is not void for uncertainty; 2d, That leaving to the court the power to fix the penalty for each offending according to its circumstances, was not unauthorized.

2. Where a municipal charter act provides that a majority of the members of the Council shall be required to form a quorum for the transaction of business, and a rule of proceeding adopted by the Council prescribes that a proposed ordinance may be passed on its first reading by a majority vote of the members present, and then placed on a second reading by a like vote; and if passed on its second reading may then be read as passed as a whole on such second reading, but no ordinance shall be put on its third reading at the same meeting at which it is read the first time except by unanimous consent of the Council, the term "unanimous consent of the Council," means all the members who may be present at the time the action as to putting the ordinance on its third reading is taken, whether a bare quorum or more. It does not require that every member of the Council shall be present and consent.

3. Where a municipal government, in the exercise of the police power, imposes a license charge on a business which, for the protection of the health of the community, requires daily inspection and supervision, the amount of the charge will be presumed to be reasonable, and not a tax for revenue, unless the contrary appears on the face of the ordinance, or is established by proper evidence. The courts will not seek to avoid an ordinance by nice calculations of the expense of enforcing

police regulations, but will promptly arrest any clear abuse of the power. A monthly license fee of five dollars for vending fresh meats outside of the public market, at places called private markets, *Held*, under the facts agreed upon as to the expense of regulation, not to show an abuse of the power.

Writ of Error to the Circuit Court for Duval County.

The facts of the case are stated in the opinion.

*Walker & L'Engle* for Plaintiff in Error.

The error assigned in this Court, upon the judgment rendered by the Circuit Judge, embraced and presents to your Honors the three propositions upon which the said Atkins based his petition to the said Circuit Judge for a writ of *habeas corpus.* That is to say, the plaintiff in error, by his said assignment, presented to this Court, and now contends that the Circuit Judge, in remanding him to custody, erred in holding upon said three propositions, that the said ordinance of the said city is valid, as against the said Atkins' contention that the same is void.

The first proposition then, against the validity of the ordinance, so far as this plaintiff in error is concerned, is, that the ordinance, so far as the provision for the penalty goes, is void, because that section leaves it to the arbitrary discretion of the Judge of the Municipal Court to assess such a fine, not exceeding five hundred dollars, or imprisonment for such a term, not exceeding ninety days, as he may see fit in the individual instance before him, and thus, as was pointed out by Judge Ormond, who delivered the opinion of the Alabama Court, in Yuille against the City of Mobile, 3d Ala., 137, the corporation becomes "a judge in its own cause." This is the case read and commented upon by counsel for petitioner in the-oral argument, and referred to by Mr. Bishop in support of the text in his work on Stat-

utory Crimes, at paragraph 25, in his discussion of municipal by-laws, bottom page 22. There, Mr. Bishop uses these terse words: "And when the penalty was that the offender pay a fine not exceeding fifty dollars, to be recovered before the Mayor, the by-law was adjudged void." The other authorities in support of this proposition, referred to in the argument, are State vs. Rice, Supreme Court of North Carolina, decided May 2, 1887, and reported in 2d S. E. Rep., page 180. As this report is not in the Supreme Court library, we must beg of your Honors the favor to look at the proper State Report which you have, and which the Chief Justice kindly endeavored to assist us in finding for use in the argument made on the 13th instant before your Honors assumed the bench to hear the cause. We think it must be somewhere between the 93d and 100th volume of North Carolina Reports.

In the opinion in that case, which embraces less than twenty lines, Judge Merrimon, who delivered the decision, cites State vs. Crenshaw, 94 N. C., 877, and State vs. Cainan, same report, page 883, as also Commissioners vs. Harris, 7 Jones, (N. C.), 281. Judge Merrimon said: "We cannot distinguish this case from State vs. Crenshaw, 94 N. C., 877, and State vs. Cainan, Ib. 883. In those cases, and that of Commissioners vs. Harris, 7 Jones, (N. C.), 281, it was held that a town ordinance that left the fine to be imposed uncertain as to the amount of the same, was void for uncertainty. Here the fine to be imposed might be five dollars or any less sum. It was therefore uncertain, and the ordinance void." And the principle seems to be plain. In the case at bar, the Judge of the Municipal Court might impose a fine of five hundred dollars for the mere failure on the part of this prisoner to obtain his license under said ordinance before the morning of the second day of any month. It

might be that he was unable to pay it. If so, his remedy for such a grievous wrong is prescribed by Section 7, on page 55, of the published ordinances, that is, to give a bond for appeal within three days, with good and sufficient security in double the amount of the fine, namely, $1,000.00, and for costs, and failing in this, the inevitable result would be, we apprehend, that he must lie in the city jail for ninety days. The excessive fine could not be relieved, we believe, by *habeas corpus*, nor do we perceive that it would follow even if he could give the bond, that the Appellate Court would have the right to say that error had occurred simply because the fine should *appear* to be excessive.

And therefore, we submit that upon principle, in reason, and by the authorities, the ordinance in question, as regards the penalty, is absolutely void, and ought not, at least, cannot be enforced.

The second proposition is, that upon an inspection of the certified copy of the minutes of the meeting of the City Council, when said ordinance was adopted, to be found in the record, it is apparent that rule 25 on pages 14 and 15 of the rules and regulations of the City Council of said City was disregarded. This rule is as follows : " In acting upon ordinances, the whole ordinance shall first be read and then passed, or otherwise disposed of by a majority vote of the members present: if passed on the first reading, it may then be taken up, placed on second reading by a like vote, read by sections and passed or otherwise disposed of by the same vote, and if passed on second reading, it may then be passed as a whole, or otherwise disposed of: *Provided*, No amendments shall be in order on the third reading; and *Provided further*, No ordinance shall be put upon its third reading at the same meeting at which it is read the first time, except by unanimous consent of the

council; and *Provided further*, The vote on the third reading shall be taken *viva voce* on call of the roll, the affirmative vote of a majority of all the members of the Council being necessary for its passage."

The ordinance, as your Honors will see, had been vetoed by the Mayor, and was taken up at the meeting fifth of August, 1890, and upon motion placed back upon its second reading. Now it may be, that technically speaking, as was argued by the City Attorney, on account of this statement in the minutes of that meeting, this was not the same meeting at which it was read the first time. If so, however, then it must be because *in effect* at the former meeting when it was adopted, and before it was transmitted to the Mayor, it was read the first time, and then further action was postponed, as matter of law, until the meeting of the fifth of August; but our construction is, that to all intents and purposes, the ordinance was proposed and passed upon its first, second and third reading, all at the same meeting, and if so, then rule 26 was positively violated, because the unanimous consent of the Council, made the basis of the right of these representatives of the people to act, was not had, and the ordinance was put upon its third reading at the same meeting at which it was read the first time by unanimous consent of thirteen men composing that body upon the occasion in question, and not of the eighteen who composed the City Council.

Again, this view is reinforced by the fact that unless it be the correct construction, then this whole ordinance is void, for the reason that in Section 2 of Article 3 of the City Charter, see page 9, we find the language: "No ordinance or portion of an ordinance vetoed by the Mayor shall go into effect unless the same be passed by two-thirds of the whole number of members of the City Council." Now one

of two constructions must here be correct, namely, either that this ordinance must be regarded as having been for all purposes presented for the first time at the meeting of the fifth of August, when it was adopted, or that at that meeting it was placed for the first time upon its second reading.

If the latter construction prevails, then it is not a law, because the affirmative vote recorded, as will appear by the certified copy of the minutes, was eleven, but it requires twelve voting affirmatively to meet the requirements of two-thirds of the whole number of members of the City Council, provided by Section 2 as the prerequisite to the legal adoption of any ordinance or portion thereof, which was vetoed by the Mayor ; if, on the other hand, the first construction above supposed be the correct one, then we have an instance of an ordinance presented and properly adopted upon the first and second reading, and placed upon its third reading and adopted, not by the unanimous consent of the whole council, as required by rule 26, but only upon the consent of thirteen members, barely one more than two-thirds of the whole membership, and we submit therefore, that the adoption of this ordinance departed from the law and the rule and regulation of the said City Council.

The third proposition of the prisoner at the bar against the validity of the ordinance in question is, that in attempting to use the grant of the power to license, the City Council, in imposing the sum of five dollars per month for the privilege of pursuing the vocation embraced, and requiring the permit to be obtained each and every month during which the privilege is exercised, used the license as a tax to raise revenue. That is to say that the amount charged and the requirement that the license be taken out monthly, stamps the ordinance as a trespasser on the domain bounded

by the line drawn by the City Charter, and sanctioned by the opinion of this Court in the Ledwith market case, whereby the City Council was confined under the grant of the power to license to the demand of a sum sufficient to defray the expense of making out the license, and to pay that attendant upon the sanitary supervision of the business of selling fresh meats at the place licensed.

We commend to your Honors' attention the fact agreed upon, and contained in the record before you by which it is shown that in 1888 there were 37 private markets in the city, and in 1889, 25, and that when the ordinance was passed in 1890, there were 22 persons engaged in the business under consideration, In 1888 the sanitary force numbered five ; there was the same number in 1889. In 1890, by the same ordinance as the one now contested, the force was increased by one, making six in all. The expense in 1888 for sanitary purposes was $3,420.00 1889, $4,880.00. In 1890, there was added to that for 1889, and for the additional officer, $1,020.00, making an expense of $5,340.00. Now, it is agreed that the sanitary force did all the business of inspection including these private markets in the years 1888 and 1889, and it will be observed that the salaries of these officials were increased in 1889 over the amount for 1888 by $1,430.00 ; and again a clear deduction from the agreed statement of facts is . that the city placed itself in position by the passage of this ordinance in 1890, in view of the fact that there were 22 private market men, to obtain one hundred and ten dollars per month with which to pay $85.00 per month, the salary of the new officer, or $1,320.00 per year with which to pay his annual salary, $1,020. .

Thus, at the start, presenting in the expected realization of the presumption involved, a surplus of $25.00 per month, or $300.00 per year over and above all that could be re-

quired to pay this new officer added to the sanitary force for the first time in the history of the city. Nor can this result be mitigated by reference to the fact that the city had also to pay in 1890 for the destruction, and the carriage to the place of destruction, of the condemned meats; for the city had to do this also in the two previous years. It is singular, that while the city had five sanitary officers in 1889, the same as in 1888 to whom they paid an increase of one thousand four hundred and sixty dollars in 1889 over the amount paid the same number of force in 1888, this *excise* as it is called, of five dollars per month from the defendant and those like situated, was required, yet, in 1890, with one officer added to the number and his salary increasing the expense to $1,020.00, and the aggregate expense for sanitary force at large was increased by $460.00 over that of 1889, and by $1,920.00 over that of 1888, the defendant and those *in consimili casu* were not required to pay any more than the five dollars required of them in 1889 when no such officer as the market inspector existed. We say this is singular for the reason that it is strenuously contended that this ordinance provides that all the moneys received from private market men are to be kept separate and apart in a fund to itself to be devoted exclusively to the payment of the salary of the special market inspector, and to be used for no other purpose, yet, no such provision was made in 1889 by the ordinance, which passed in review before your Honors in the Ledwith market case, and hence, we must conclude that if collected under the latter ordinance, that of 1889, it was devoted either, generally to the payment of the expenses of compensating the sanitary force at large then existing, or at least to that force exclusive of the salary of the health officer of the city. But in 1888 the city paid to the sanitary inspectors $1,920.00, and to them was

entrusted the duty which it is presumed they performed of the inspection and sanitary supervision of the entire city, including 37 private markets. The arguments advanced that the year 1888 is not a fair example because of the existence of the epidemic, will not bear examination, because it was just as necessary to inspect the 37 markets in 1888 *prior* to the epidemic as the 25 markets any day when they existed in 1889 *after* the epidemic, and it was just as expensive and laborious in the one instance as in the other. In 1889, the city paid to the immediate sanitary force, exclusive of health officer, $2,880.00. In 1890, exclusive of health officer and the special market inspector, $3,720.00, and we have the spectacle presented of the declared ability of the city with five sanitary inspectors in 1890 at an expenditure of $3,720.00 exclusive of the sanitary inspector, as against its power in 1889 with five sanitary inspectors at an expenditure of $2,880.00 to look after and care for in the last named year 25 private markets, and in the first named year of 22 such places ; that is to say, to say nothing of the market inspector, it required in 1890, $840.00 more to take care of three in number less private markets than existed in 1889, and if the salary of the new officer be taken into consideration, it required $1,860.00 more and an additional officer over the situation in 1889 when there were three more private markets than in 1890.

But all of this presentation can, perhaps, be plausibly argued away by saying so far as the addition of a new officer is concerned, that the force as it stood without him *claimed*, as is agreed, that they could not attend to the private markets and at the same time discharge their other duties, but this does not account for paying that force $840.00 more in 1890 over what they were paid in 1889, and at the same time relieving them of any attention to the

private markets. A business man, in 1889, finds that it is necessary to add to his business something which will increase his income five dollars per month. In 1890, he finds it necessary to increase his expenses $85.00 per month, but strange to say, does not feel called upon to increase his income by one cent. How is this ? There can be but one answer : He was mistaken in 1889, and did not need the five dollars addition to his revenue, and more than this, he was so badly mistaken that at the end of the year he finds that he can afford to spend eighty dollars more and add nothing at all to his income, because upon looking into it, he discovers that when he added the five dollars per month in 1889, he was getting in eighty dollars more than was necessary to pay his expense account and create the point of departure for realizing a profit in his business, and acting upon the wise axiom that one must grow rich naturally and gradually in the same way that the tender shoot puts on leaf by leaf, expanding its limbs into branches in the due order of nature until the tree is grown, in order to prevent his inevitable conviction *in foro conscientiæ*, he permits his imagination to conclude that he needs and has needed all the time a new servant whose services he cannot possibly have for less than $85.00 per month.

There is something too in the fact to emphasise this view that his usual customers, finding when their accounts are presented that there is an immense overcharge for the month in their accounts, as against the preceeding month, rebel and inquire why this is so when there has been no change in the necessary expenses to him, and they are told that they are mistaken, and that he has suddenly found that in order to their decent presence in his establishment, it is necessary that an additional servant is required to superintend their habits. In vain they reply that there has been

no change for the worse in them, to which he does not demur, and in vain they insist with him that the old retinue are performing their same services under the same conditions which have satisfied him so long in the past. His rejoinder is, you must pay my exaction or you must quit the business.

It is agreed that fifty cents will cover all the expense attendant upon issuing the license, the possession of which will authorize the conduct of a private market in the territory outside of that bounded by the limits of the public market in this city. Yet, it is contended that this certificate of authority to pursue the business in question in order to regulate the same must be applied for and obtained twelve times per annum. Why is this? We submit to your Honors the very pertinent argument made by Judge Deady in the case *in re*. Wan Yin, 22 Fed. Rep. 701, and which is quoted at some length on page 532 of the 13th Volume of the Am. & Eng. Encyclopedia of Law, which we had the pleasure of seeing, if we mistake not, in the Supreme Court Library. His language is, in reference to the twenty dollars charged by the Council of Portland, Ore., for the privilege of operating wash houses in that city for a year, and which was made payable quarter-yearly as follows: "An annual license is sufficient for all purposes of regulation, and nothing more is usually required for that purpose. But the provision requiring the license to be taken out quarterly is strongly suggestive of revenue rather than regulation." That is the expression used by a Judge whose reputation for comprehensive grasp, wide survey, and logical annalysis of all questions involving legal judgment, is well borne out by his judicial utterance of the conclusion arrived at in the case from which we quote. We respectfully submit that the law which should control our

conclusion in the case at bar arising upon the history of the facts presented is abundantly illustrated by the following cases, which in our opinion, prove conclusively that instead of a license under the power of police regulations granted by its charter, the City Council of the City of Jacksonville, when they required by the ordinance under consideration the payment of five dollars per month for the privilege of vending fresh meats, etc., outside of the public market, they in effect use the license power as a *tax to raise revenue.* We refer to the cases of Ash vs. The People, 11 Mich. 347, *in re.* Wan Yin, 22 Fed. Rep. 701, and the case therein cited of Dutwall vs. New Albany, 25 Ind. 283, Jackson vs. Newman, 59 Miss. 385, cited in Am. & Eng. Enclycopedia of Law, Vol. 13, page 533, as also Mankato vs. Fowler, 32 Minn. 364, cited on same page of same work.

We also submit the latest case touching the subject in hand, which we have been able to examine, and which we used in the oral argument of State vs. Rowe, Court of Appeals of Maryland, decided June 30, 1890, reported pages 179 and 180 in No. 5. Vol. 20. of the Atlantic Reporter.

*J. M. Barrs,* for Defendant in Error.

RANEY, C. J.: The 28th section of "An ordinance to regulate the vending of fresh meats, dressed poultry and fish, and to establish and regulate markets," adopted by the City Council of Jacksonville, and which was approved by the Mayor, August 9, 1890, provides that a violation of any of the provisions of the ordinance shall be punished by a fine not exceeding $500, or by imprisonment for a term not longer than three months for the same offence. The fourth section of the third article of the charter act, Chapter 3775, statutes of 1887, enacts that the Mayor and City Council

"shall within the limitations of this act have power by ordinance * * to impose fines, forfeitures, penalties and terms of imprisonment for the breach of any city ordinance, but no penalty shall exceed five hundred dollars, and no term of imprisonment shall be for a longer term than three months for the same offense ;" and the first section of the tenth article provides for a municipal court for the trial of all offences against the municipal ordinances.

It is contended on behalf of plaintiff in error that the ordinance is invalid because the 28th section leaves it to the arbitrary discretion of the Judge of the Municipal Court to assess such a fine, not exceeding five hundred dollars, or imprisonment for such a term not exceeding three months as he may see fit in each particular case before him.   The cases of Mayor and Aldermen of Mobile vs. Yuille, 3 Ala., 137 ; Commissioners vs. Harris, 7 Jones, 281 ; State vs. Crenshaw, 94 N. C., 877 ; State vs. Cainan, *Ibid*, 883 ; State vs. Rice, 97 *Ibid*, 421, are relied upon to support this position. In Mayor, etc. vs. Yuille, the penalty as prescribed by the ordinance was "not more than fifty dollars," and it was held to be void for uncertainty.   "The penalty," says the opinion, which refers to cases collected by Angell & Ames on Corporations, 200, and Wilcock on Corporations, Section 302, "must be a sum certain, and cannot be left to the arbitrary assessment of the corporation court, to be determined according to the nature of the offence.   It is also said that although the utmost limit of the penalty be fixed, beyond which the fine cannot extend, that it does not remove the objection.   The reason assigned is that it permits the corporation to be a judge in its own cause."   This decision was expressly overruled in Mayor, etc. of Huntsville vs. Phelps, 27 Ala., 55, where it was held that a municipal by law is not rendered void for uncertainty because

the amount of the penalty imposed for its violation is left discretionary, within fixed limits, with the Municipal Court; and it is said in the opinion: the fact that the corporation is made the judge in its own cause is no objection since it applies whether the penalty is for a specific sum, or is fixed within certain limits; the question whether the ordinance has been violated is to be determined in either case by the corporation; the penalty being any sum "not exceeding fifty dollars," a reasonable discretion is given to be exercised within certain limits; and we can see no objection which could be urged to such a by-law which could not with equal propriety, be made to any law investing courts or juries with discretion in apportioning the fine to the offense, the fine being restricted within reasonable bounds.

The law as stated by Judge Dillon in his work on Municipal Corporations, Sec. 341 (4th ed.), is that such a corporation of this kind with power to pass by-laws and affix penalties, may, if not prohibited by the charter, or if the penalty is not fixed by the charter, make it discretionary within fixed reasonable limits; that this enables the tribunal to adjust the penalty to the circumstances of each particular case; and that the older English authorities, so far as they hold such a by-law void for uncertainty, are regarded as not sound in principle and ought not to be followed. See State vs. Cantieny, 34 Minn., 1.

There is in the North Carolina cases nothing that to our minds establishes the correctness of the overruled Alabama case; in the leading one of them, Commissioners vs. Harris, the ordinance provided that the offender should be carried before the Police Magistrate and fined "not less than one, nor more than twenty dollars," and the Supreme Court held it void for "vagueness and uncertainty." It is said, however, in the opinion that this method of imposing penalties com-

mended itself as leaving the matter open until the evidence is heard, and the aggravating or mitigating circumstances are found, but that the method was impossible on account of the settled mode of procedure in that State, which mode was that the proceeding when brought to the Superior Court on appeal, which appeal vacated the judgment of the Police Magistrate, was a civil one in the nature of an action of debt, and such action obtained only for a certain amount, which a sum "not less than one, nor more than twenty dollars" was not; and there was no power in the Superior Court for the judge or jury to fix the punishment. No such difficulty, it may be observed, exists with us. The proceeding before the Municipal Court of Jacksonville is criminal in its character, and so it is on appeal in the Circuit Court, and the judgment to be rendered by the latter tribunal is one of affirmace or reversal. *Ex-parte* Peacock, 25 Fla., 478.

A decision—Mellick vs. Washington, 47 N. J. Law, 254, if not that of State vs. Zeigler, 32 *Ibid*, 262—suggests at least more distinctly than those mentioned above the want of power in the council to leave to the magistrate the duty of fixing the penalty for each particular offender according to its circumstances, within the limits prescribed by a charter act like that in question, and holds that the council must fix the exact penalty for each case. Our opinion, following the line of Judge Dillon's views, and the Alabama and Minnesota courts is, that it was not the purpose of the Legislature to thus restrict the law-making power of the city. It is to our minds much more just and reasonable that the ordinance should prescribe the limits of punishment for each character of offense, and that the tribunal created to try the offender should fix the punishment in each particular case according to its mitigating or aggravating circumstances

than that one penalty should be prescribed by the council for all offendings against any one ordinance. Such, as far as we have any information, has been the uniform practice in this State ; and the function performed by the trial court is one within the contemplation of the organic act providing for it. The Constitution, Section 34, Article V, authorizes the Legislature "to establish in incorporated towns and cities courts for the punishment of offences against municipal ordinances." This it has done in the case before us, and the function of adjusting the punishment within the limits prescribed by the municipal law, is judicial in its character. We think the objections urged to the ordinance are not valid.

II. The next objection is, that the ordinance was not passed in accordance with Rule 26 governing the council in such cases. This rule is one of a series adopted June 11, 1889, under Section 1 of Article 3 of the Charter Act, as amended May 16, 1889, by Chapter 3952 of the statutes, which provides that the council may determine its own rules of proceeding and is as follows : "In acting upon ordinances, the whole ordinance shall be first read and then passed, or otherwise disposed of, by a majority vote of the members present; if passed on first reading, it may then be taken up, placed on second reading, by a like vote, read by sections and passed, or otherwise disposed of, by the same vote, and if passed on second reading, it may then be read as a whole, as passed on said second reading, and passed, or otherwise disposed of ; *Provided*, no amendments shall be in order on the third reading ; and *provided, further*, no ordinance shall be put upon its third reading at the same meeting at which it is read the first time, except by unanimous consent of the council ; and *provided, further*, the vote on the third reading shall be taken *viva voce* on the call of

the roll, the affirmative vote of a majority of all the members of the council being then necessary for its passage."

The point is, that the "unanimous consent of the council" required by this rule to put an ordinance on its third reading at the same meeting at which it is read the first time, means the unanimous consent of the entire council, and that the unanimous consent of a less number present and constituting a quorum is not sufficient.

The charter act provides in the section last mentioned that a mojority of the members of the council shall be required to form a quorum for the transaction of business; but a smaller number may adjourn from day to day. A majority of the whole number of members constitute, when assembled, and, in the eyes of the law are, the "council" for the transaction of business, as much and as effectually as the whole number are, and wherever the action by the council is required, or the council is referred to in connection with the "transaction of business," a majority of the whole number of members will fill the requirement or answer the reference, unless there is something in the language of the requirement or reference expressly calling for a larger number. The term "council" as used in the rule in connection with the requirement of unanimous consent, means, the council, or the members, present at the time of the proposed action of putting a bill on its third reading. Of course there must be present a majority of the whole number of members to constitute a quorum, at least ten of the eighteen, but whether there are present only a majority, or the eighteen members, or any intermediate number, the consent of all actually present is necessary. A majority vote of the quorum can put the proposed ordinance on its second reading, but to put it on its third reading on the same day that it was read the first time, the unanimous con-

sent of all present, whether a bare quorum or more, is required by this rule. Its language is not susceptible of a construction requiring more. The last proviso of the rule, in so far as it requires a "majority of all the members of the council" for the final passage of a proposed ordinance is nothing more than the requirement of the second section of the third article of the organic act. P. 164, Acts of 1887.

The ordinance in question has received the approval of the Mayor, and even if the point had not been abandoned in this court on the oral argument, there could be no room for the application of the provision of the section of the charter act last mentioned : that no ordinance, nor portion of an ordinance vetoed by the Mayor, shall go into effect unless the same be passed by two-thirds of the whole number of members.

III. The remaining objection urged against the ordinance is that under the guise of using the police power to regulate the vending of meats, poultry, etc., and to provide for and regulate their inspection, it levies a tax for the purposes of revenue. The grounds of this contention are the amount of the license fee, which is five dollars per month, and the fact that the license has to be taken out monthly.

In City of Jacksonville vs. Ledwith, 26 Fla., ——, S. C. 7 So. Rep., 885, where the present charter of the city was under consideration, we held that the grant of power to regulate the vending of meats, poultry, fish, etc., did not give power to tax for purposes of revenue the occupation of vending any of the named articles, but that it, in connection with the grant of power to regulate inspection of beef and other provisions, would justify the imposition of such fees and charges as would cover the expense of both inspecting the articles of food offered for sale and of the police supervision of the business necessary to prevent its becoming hurtful to the community.

The amount of a license fee or charge is to be considered in determining whether the exaction is not really one of revenue or prohibition, instead of one of regulation under the police power.  The amount will be presumed to be reasonable unless the contrary appears on the face of the ordinance, or is by evidence shown to be so.  Van Hook vs. City of Selma, 70 Ala., 361 ; Commonwealth vs. Patch, 97 Mass., 221 ; St. Louis. vs. Webber, 44 Mo., 550 ; Van Baalen vs. People, 40 Mich., 258.

The amount of the fee might in some cases be so large, as to suggest of itself, considering the character of the business to which it was applied, that it was in fact a tax for revenue, but considering the nature of the subject regulated by the ordinance before us—the sale of fresh meats, dressed poultry and fish, in a city containing at least seventeen thousand inhabitants, in buildings away from the public market, which buildings, as well as the articles offered for sale, are deemed by the local authorities to require, for the protection of the health of the community, daily inspection and supervision—we cannot undertake to say that it will not require five dollars per month to pay the expense required by the issue of the license, and by inspection and supervision.  The amount does not, in view of the character of the business, and the other facts appearing in the record, satisfy us that the law-making power of the city has attempted an abuse of its trust and a wrong upon those who may desire to pursue the avocation regulated.  It seems from this statement that in the year 1888 there were 37 of these places of business, called Private Markets, where fresh beef was sold, and in 1889 there were 25 of them ; whereas, at the date of the passage of the ordinance in question there were only 22.  Also that in 1888 there were one City Physician with a salary of $900 per annum, and four sanitary

inspectors, one having a salary of $720 per annum, and the others at $600 per annum, and in 1889, there was a City Health Officer, with a salary of $2,000 per annum, and four sanitary inspectors with salaries of $720 each; and that in the present year up to the date of the ordinance, August 11th, there had been in the employ of the city one health officer at a salary of $1,200, out of which he is required to pay clerical help $600 per annum, one sanitary inspector at an annual salary of $840, and four sanitary patrolmen with salaries of $720 each per annum. That before this ordinance there was no city officer whose special duty it was to inspect markets and the fresh meats offered for sale, or to perform any other duties of the present officer, the Market Inspector, provided for by such ordinance, and such inspection as was made at all was made by Sanitary Inspectors and patrolmen, and no special license was required to engage in the business of selling fresh meats, and any person could engage in such business without paying any special fee or charge for inspection.

This agreed statement shows that in 1888, when there were 37 so-called private markets, there were only five health or sanitary officers, and that they were paid $3,400; and in 1889, when there were 25 such markets, there were likewise five such officers who were paid an aggregate of $4,480, or $1,460 in excess of the former year, and in the present year up to the approval of the ordinance there have been only 22 of the markets, yet six officers who were paid at the aggregate rate of $4,920 per annum, including $600 for clerical hire. From these facts and the further one that this year the ordinance in question has created the office of Market Inspector at a salary of eighty-five dollars per month, payable monthly, the reasonableness of which salary is not impugned, and has imposed the charge of five

dollars per month on each market, the charges on 22 markets aggregating $110 per month, it is argued that the deduction is clear that the city placed itself in a position, by the passage of the ordinance, to obtain one hundred and ten dollars per month with which to pay eighty-five dollars per month as the salary of a new officer, or to obtain $1,320 per annum to pay a salary of $1,020.

Thus far the statement of the facts shows that there is an excess of twenty-five dollars per month over expenses, but it is also agreed that the issue of each license reasonably costs fifty cents, and thereby the excess is reduced to eleven dollars per month, and then follows the further agreed statement that the city is compelled "for the sake of regulating the sale of fresh meats so as to protect the health of the people," to pay for the removal and destruction of the bad meats, and that it has to furnish stationery for reports. What the cost of removing and destroying bad meats from these "private markets," or of the stationery necessary for reports as to their regulation and inspection may be, is not shown, nor can we assume that these items will not consume the eleven dollars. It is a subject on which we could have no judicial knowledge, even if it were certain that the number of these markets would continue to be twenty-two. The margin is too small to permit us to assume that it will more than pay the expenses of the items of which no estimate is given. In view of these unexplained items we do not see that the deduction is either " clear " or permissable, that the law-making power of Jacksonville has placed itself in a position to obtain one hundred and ten dollars per month with which to pay eighty-five. It is expressly agreed that " the ordinance is the declaration of the legislative judgment of the city authorities that it was impracticable to have the markets and fresh meats so inspected as to prevent the sale of

meats which are unwholesome and dangerous to the health of the public, without the employment of a special inspector, whose sole duty this should be, and that the employees of the health department claimed that the other duties left them no time to inspect the markets," and upon the facts presented by the record, we think it must be assumed that the purpose of the law-making power was that the fourteen dollars should be used to pay the items of expense of which no estimate is given by the parties, and that there is no error in its judgment that a less amount would safely answer the requirement. As is said in Van Baalen vs. People, *supra:* The subject will not admit of nice calculation, and it would be futile to require anything of the kind; and where the power to license is not evidently abused and made a pretext for doing what is contrary to constitutional right, the courts ought not to interfere with municipal discretion.

Parties conducting the business in question away from the public market, and thereby rendering additional police expense indispensable to the preservation of the public health, may be required to bear the reasonable additional expense they occasion. The city cannot make gain under an illegal exercise of the police power, and if it shall at any time appear or be shown that she is doing so, the regulation by which it is effected will be held void. This should be kept in careful view at all times by the authorities, for though the courts will not be astute to avoid the regulation by making nice calculations, they should promptly arrest any clear abuse of the power.

That the license has to be taken out monthly, each one expiring on the first day of the succeeding month, does not suggest anything unreasonable. Assuming that the fee is reasonable, we think the plan adopted is more considerate of the pecuniary convenience of parties who may desire to en

gage in the business, than the prescription of a longer period, and hence a larger payment for each license would be. We have not failed to consider carefully the view announced by Judge Deady in the Laundry License case, 22 Fed. Rep., 699, 704, where there " was nothing in the business or pro-posed regulations for which the city was likely to incur any special expense," that the provision requiring the license to be taken out quarterly is strongly suggestive of revenue rather than regulation.

The judgment is affirmed.